## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 NOV 21  AM 8: 25

M... ... ...INS, CLERK
CASPER

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **No.   19-CR-026-ABJ** |
| Plaintiff, | **Cts 1-8:   18 U.S.C. § 1343** (Wire Fraud) |
| **v.** | **Cts 9-10:   18 U.S.C. § 1348(1)** (Securities Fraud) |
| **ROBERT WILLIAM MITCHELL,** a/k/a Bob Mitchell, (Counts 1-15) | **Cts 11-12:   18 U.S.C. § 1341** (Mail Fraud) |
| **JUSTIN WALLACE HERMAN,** (Counts 13-19) | **Ct 13:   18 U.S.C. § 371** (Conspiracy to Commit Securities Fraud) |
| **CHARLES WINIFRED WINTERS JR., a/k/a Chuck Winters,** (Counts 13-17) | **Ct 14:   15 U.S.C. §§ 78j(b) and 78ff and 18 U.S.C. § 2** (Securities Fraud and Aiding and Abetting) |
| **and** | **Ct 15:   18 U.S.C. § 1349** (Conspiracy to Commit Wire Fraud) |
| **IAN HORN,** (Counts 13-15) | |
| Defendants. | **Cts 16-19:   18 U.S.C. § 1028A(a)(1)** (Aggravated Identity Theft) |
| | **\*\*FORFEITURE NOTICE\*\*** |

## SECOND SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES THAT:

      1.      The United States Securities and Exchange Commission (SEC) is an agency of the

United States government that enforces federal securities laws. The SEC has the power to suspend

the public sale of regulated securities, and to prohibit individuals from participating in offerings of regulated securities.

2.      On March 30, 1999, the SEC barred Defendant **ROBERT WILLIAM MITCHELL, a/k/a Bob Mitchell,** from participation in penny-stock offerings. This order was in effect at all times relevant to this indictment.

3.      On January 25, 2013, Defendant **MITCHELL** organized Bravo Two Zero Partners LLC as a Colorado limited-liability company. That same day, **MITCHELL** opened an account at JPMorgan Chase Bank (which account number ended in 2110) in the name of Bravo Two Zero Partners LLC. **MITCHELL** controlled this account as the only authorized signer.

4.      On February 5, 2014, Defendant **MITCHELL** opened an account at Wells Fargo Bank (which account number ended in 5707) in the name of Bravo Two Zero Partners LLC. **MITCHELL** controlled this account as the only authorized signer.

5.      Beginning May 27, 2008, and continuing through at least April 13, 2015, EcoEmissions Solutions Inc. (EcoEmissions) was an issuer of securities required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78$o$(d)).

6.      On March 23, 2015, EcoEmissions filed with the Delaware Secretary of State amendments changing its name to NuTech Energy Resources Inc. The company continued, however, to use the name EcoEmissions on stock certificates.

7.      On June 26, 2015, NuTech Energy Resources Inc. (NuTech) changed its trading symbol from ECMZ to NERG.

8.      The SEC suspended trading of NuTech stock on May 20, 2016.

9.      Beginning no later than 1983 and continuing through at least April 8, 2016, Elite Data Services Inc. a/k/a DEAC was an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*).

### THE SCHEME TO DEFRAUD INVESTORS

10.     Beginning on a date unknown to the grand jury but no later than May 18, 2012, and continuing through at least January 17, 2017, Defendant **ROBERT WILLIAM MITCHELL, a/k/a Bob Mitchell**, with intent to defraud, knowingly devised and intended to devise a scheme and artifice to defraud ("the scheme"), and **MITCHELL** willfully participated in the scheme with knowledge of its fraudulent intent.

11.     Investors and potential investors believed a natural gas production venture could be profitable by using a downhole tool to reduce production costs, and by taking control of existing but unused wells. As part of the scheme, Defendant **MITCHELL** encouraged and took advantage of this belief by (among other things) claiming that he had a legal right to a number of existing wells free and clear of any debt.

12.     It was further part of the scheme that Defendant **MITCHELL** told potential investors, and caused other individuals to tell potential investors, that **MITCHELL** could make a natural gas production venture successful by using investors' money to acquire and "clean up" a shell company, and then use the cleaned-up shell to enrich investors by giving them shares of a public company, which shares the investors could then sell. In fact, **MITCHELL** did not intend to make the natural gas production venture successful, and did not intend to give, and did not give, investors shares that the investors could sell or otherwise use to enrich themselves.

3

13.     It was further part of the scheme that Defendant **MITCHELL** told potential investors, and caused other individuals to tell potential investors, that investors' money would be used to pay business expenses. In fact, **MITCHELL** intended to use, and used, a majority of investors' money to pay his personal expenses.

14.     It was further part of the scheme that Defendant **MITCHELL** caused a stock transfer company to issue restricted shares of EcoEmissions common stock to investors in Wyoming and elsewhere. **MITCHELL** did this at least in part to give investors the false impression that the natural gas production venture was moving forward and they would see a return on their investments.

15.     It was further part of the scheme that Defendant **MITCHELL** used false information to convince a stock transfer company to issue free-trading shares of NuTech stock to **MITCHELL**, individuals related to **MITCHELL**, and entities controlled by **MITCHELL** and related individuals.

16.     It was further part of the scheme that Defendant **MITCHELL**, and related individuals and entities, sold NuTech shares to the public. **MITCHELL** concealed these sales from investors in Wyoming, and did not share the money he earned from these sales with investors in Wyoming.

17.     It was further part of the scheme that Defendant **MITCHELL** withheld from investors in Wyoming original stock certificates for free-trading shares of NuTech.

18.     It was further part of the scheme that Defendant **MITCHELL** concealed his involvement with, and control over, NuTech by employing a nominee chief executive officer to sign documents and to make statements to investors and to the public.

4

19.     It was further part of the scheme that Defendant **MITCHELL** concealed from investors that he was barred by the SEC from participation in penny-stock offerings.

20.     It was further part of the scheme that Defendant **MITCHELL** solicited investments in Elite Data Services Inc. a/k/a DEAC by claiming that DEAC was a way for investors to recoup losses from their Nutech investments, and by promising returns within weeks. In fact, **MITCHELL** used the investors' money to pay his personal expenses.

## COUNTS ONE - EIGHT
### Wire Fraud – 18 U.S.C. § 1343

21.     On or about the dates listed below, in the District of Wyoming and elsewhere, with intent to defraud, and for the purpose of executing the scheme described in paragraphs 1 - 20 (which are incorporated herein), and to obtain property by materially false and fraudulent pretenses, representations, and promises, Defendant **ROBERT WILLIAM MITCHELL, a/k/a Bob Mitchell**, did knowingly cause signs, signals, and sounds to be transmitted in interstate commerce by means of wire communication; specifically, the below-listed transfers of money from Wyoming to a bank account held in the name of Bravo Two Zero Partners LLC in Colorado.

| COUNT | DATE | WIRE COMMUNICATION |
|-------|------|--------------------|
| One | February 7, 2014 | Wire transfer of $14,000 by D.F.B. through First Interstate Bank to a JPMorgan Chase Bank account ending in 2110 |
| Two | March 6, 2014 | Wire transfer of $10,000 from H.S. through First State Bank of Newcastle to a Wells Fargo Bank account ending in 5707 |
| Three | April 30, 2014 | Wire transfer of $50,000 from M.M. through First National Bank to a Wells Fargo Bank account ending in 5707 |
| Four | December 22, 2014 | Wire transfer of $20,000 from N.M. through First National Bank to a Wells Fargo Bank account ending in 5707 |
| Five | March 30, 2015 | Wire transfer of $30,000 from J.G. through First National Bank to a Wells Fargo Bank account ending in 5707 |
| Six | June 5, 2015 | Wire transfer of $10,000 from K.M. and N.M. through First National Bank to a Wells Fargo Bank account ending in 5707 |

| Seven | November 9, 2015 | Wire transfer of $10,000 from J.R. through First Interstate Bank to a Wells Fargo Bank account ending in 5707 |
| Eight | April 8, 2016 | Wire transfer of $50,000 from K.M. through First Northern Bank of Wyoming to a Wells Fargo Bank account ending in 5707 |

In violation of 18 U.S.C. § 1343.

### COUNTS NINE & TEN
### Securities Fraud – 18 U.S.C. § 1348(1)

22.     On or about the dates listed below, in the District of Wyoming and elsewhere, with intent to defraud, and for the purpose of executing the scheme described in paragraphs 1 - 20 (which are incorporated herein), Defendant **ROBERT WILLIAM MITCHELL, a/k/a Bob Mitchell**, did knowingly and intentionally execute a scheme and artifice to defraud a person in connection with the securities described below.

| COUNT | DATE | EXECUTION OF SCHEME |
| --- | --- | --- |
| Nine | March 30, 2015 | Defendant **MITCHELL** caused J.G. to pay $30,000 for shares of EcoEmissions Solutions Inc. a/k/a NuTech Energy Resources Inc., which company was at the time an issuer required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)) |
| Ten | April 8, 2016 | Defendant **MITCHELL** caused K.M. to pay $50,000 for shares of Elite Data Services Inc. a/k/a DEAC, which company was at the time an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) |

In violation of 18 U.S.C. § 1348(1).

### COUNTS ELEVEN & TWELVE
### Mail Fraud – 18 U.S.C. § 1341

23.     On or about the dates listed below, in the District of Wyoming and elsewhere, with intent to defraud, and for the purpose of executing the scheme described in paragraphs 1 - 20

6

(which are incorporated herein), and to obtain property by materially false and fraudulent pretenses, representations, and promises, Defendant **ROBERT WILLIAM MITCHELL, a/k/a Bob Mitchell**, did knowingly cause to be delivered by U.S. Mail, according to the direction thereon, the matters described below, each of which contained one or more EcoEmissions Solutions Inc. stock certificates.

| COUNT | DATE | DELIVERY METHOD AND MATTER |
|-------|------|----------------------------|
| Eleven | May 1, 2015 | U.S. Postal Service Priority Mail packet bearing tracking number 9405-5036-9930-0048-6269-57, and addressed to a post office box in Casper, Wyoming |
| Twelve | May 26, 2015 | Envelope bearing postage paid in Gillette, Wyoming, and addressed to a street address in Thayer, Kansas |

In violation of 18 U.S.C. § 1341.

### THE PUMP-AND-DUMP CONSPIRACY

24.     Generally, a "pump-and-dump" is a form of securities fraud where the conspirators manipulate demand for a stock and the stock's price, and then sell their shares of that stock to the public at an artificially high price. The first step in a "pump-and-dump" is for the conspirators to gain control over a publicly-traded company and that company's free-trading shares. This allows the conspirators to control the market for that company's stock. After acquiring control of a company and its free-trading shares, the conspirators will "pump" the stock's price by (among other things) disseminating false and misleading information that makes the company appear to be more valuable than it is. After fraudulently "pumping up" the price of a stock, the conspirators "dump" their shares by selling them to unwitting investors.

### COUNT THIRTEEN
### Conspiracy to Commit Securities Fraud – 18 U.S.C. § 371

25.     Paragraphs 1-8 and 24 are re-alleged for purposes of charging Count 13.

26.     Beginning on a date unknown to the grand jury but no later than on or about November 25, 2014, and continuing through a date unknown to the grand jury but at least on or about May 19, 2016, in the District of Wyoming and elsewhere, Defendants **ROBERT WILLIAM MITCHELL, a/k/a Bob Mitchell, JUSTIN WALLACE HERMAN, CHARLES WINIFRED WINTERS JR., a/k/a Chuck Winters**, and **IAN HORN** did knowingly, unlawfully, and willfully combine, conspire, confederate, and agree with one another, and with other persons known and unknown to the grand jury, to commit an offense against the United States; that is, securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5.

### *Purpose of the Conspiracy*

27.     The purpose of the conspiracy was to unjustly enrich the Defendants and their co-conspirators by artificially inflating the market price of, and demand for, the common stock of NuTech Energy Resources Inc. (NuTech).

### *Manner and Means of the Conspiracy*

28.     It was part of the conspiracy that the Defendants agreed with one another and with persons known and unknown to the grand jury to "pump-and-dump" NuTech common stock; that is, the conspirators agreed:

     a.  to acquire control of NuTech and its free-trading shares;

     b.  to artificially inflate the market price of, and demand for, NuTech common stock by causing false and misleading information about NuTech to be released to the public, and by manipulative trading of NuTech shares; and

     c.  to sell NuTech stock to unwitting investors at the artificially inflated price.

29.     It was further part of the conspiracy that the Defendants took control of EcoEmissions Solutions Inc. (EcoEmissions) through an agreement that included the purchase of convertible notes. The convertible notes allowed the holder to convert the debt represented by the notes into shares of EcoEmissions stock. At the time, EcoEmissions was a publicly-traded company using trading symbol ECMZ.

30.     It was further part of the conspiracy that Defendants **MITCHELL** and **HERMAN** changed the name of EcoEmissions to NuTech Energy Resources Inc., and changed the trading symbol to NERG.

31.     It was further part of the conspiracy that Defendant **HERMAN** paid Defendant **HORN**, who was a Florida-licensed attorney, to create and sign false and misleading attorney-opinion letters related to NuTech.

32.     It was further part of the conspiracy that the Defendants used false information (including the false and misleading attorney-opinion letters and altered documents) to convince a stock transfer company to issue free-trading shares of NuTech stock to the conspirators, individuals related to the conspirators, and entities controlled by the conspirators.

33.     It was further part of the conspiracy that Defendants **MITCHELL, HERMAN,** and **WINTERS** used nominees to hold NuTech shares in order to disguise the Defendants' ownership and control of free-trading NuTech shares.

34.     It was further part of the conspiracy that Defendants **MITCHELL** and **HERMAN** used a nominee chief executive officer, whose name was used to sign documents and to make statements to investors and to the public, in order to conceal the Defendants' involvement with, and control over, NuTech.

35.     It was further part of the conspiracy that Defendants **MITCHELL**, **HERMAN**, and **WINTERS** caused false and misleading information about NuTech to be distributed, including through a website and by means of press releases. Following the distribution of false and misleading information, and their manipulative trading, the Defendants and co-conspirators known and unknown to the grand jury sold NuTech shares to unwitting investors.

36.     It was further part of the conspiracy that the Defendants used, and caused others to use, interstate wire transmissions in furtherance of the conspiracy.

### Overt Acts Committed in Furtherance of the Conspiracy

37.     On   November   25,   2014,   **MITCHELL**   created   the   email   address kevin@nutechenr.com.

38.     No later than November 25, 2014, **MITCHELL** created and posted online the website www.nutechenr.com to publish false and misleading information about NuTech. This website was available nationwide, including in the District of Wyoming, through at least May 2016.

39.     On December 22, 2014, **MITCHELL** convinced N.M. to wire $20,000 from Gillette, Wyoming, to **MITCHELL** in Colorado. That same day, **MITCHELL** caused M.P. to wire $100,000 to **MITCHELL**.

40.     On December 23, 2014, **MITCHELL** wired $10,000 to **HERMAN** and $80,000 to **HORN**. This money came from the $20,000 N.M. wired to **MITCHELL** and the $100,000 M.P. wired to **MITCHELL** the day before.

41.     Between January 8 and January 15, 2015, **HERMAN** instructed **HORN** to wire money to T.C. and to other persons involved in the Defendants' purchase of EcoEmissions

convertible notes. This money came from the $80,000 **MITCHELL** wired to **HORN** on December 23, 2014.

42.     On January 21, 2015, **MITCHELL** and **HERMAN** directed T.C. to amend EcoEmissions' articles of incorporation to change the name of the company to NuTech Energy Resources Inc., and to authorize the issuance of up to 60 billion shares of common stock. The amendment was filed with the Delaware Secretary of State on March 23, 2015.

43.     On March 24, 2015, **WINTERS** created a login account with OTC Markets Group. This account allowed **WINTERS** to post information related to NuTech online at www.otcmarkets.com.

44.     On or before May 19, 2015, **HERMAN** and **HORN** created an attorney letter with respect to current information for NuTech as if the letter had been written by **HORN** and contained his legal opinions. In fact, the letter was written in significant part by **HERMAN** and contained false and misleading information. **HORN** did not review the information in the letter before signing and issuing it on his letterhead.

45.     On May 19, 2015, **WINTERS** used his email account to login and post the attorney letter with respect to current information described in paragraph 44 online at www.otcmarkets.com, where the letter could be accessed in the District of Wyoming.

46.     On July 10, 2015, **HERMAN** emailed documents to Pacific Stock Transfer Company to support the issuance of free-trading shares of NuTech. These documents included:

> a. a resolution of NuTech's board of directors, which bears the apparent signature of K.T. as NuTech's chief executive officer, that claims the company's board of directors had met and authorized the issuance of free-trading shares of NuTech common stock based on the "legal conversion from debt to equity as presented to the Transfer Agent, Pacific Stock Transfer"; and

b.  an instruction letter directing issuance of more than 12 billion free-trading shares to a number of individuals and entities, including individuals and entities related to **MITCHELL, HERMAN,** and **WINTERS**.

47.  On July 27, 2015, **HERMAN** sent an email to **WINTERS** with the subject line "how do we add date" and an attachment entitled "ECMZ debt assignment signed.pdf." The attachment was a debt-assignment agreement signed by T.C., G.P., and D.R. in December 2014 and January 2015. Later that same day, **WINTERS** sent an email to **HERMAN** with an attachment entitled "Debt assignment.pdf." This attachment was substantially identical to the debt-assignment agreement **HERMAN** had sent to **WINTERS** except the handwritten dates had been altered to make it appear that T.C., G.P., and D.R. had signed the agreement one year earlier in December 2013 and January 2014.

48.  On July 27, 2015, **HERMAN** emailed documents to Pacific Stock Transfer Company to support the issuance of free-trading shares of NuTech. These documents included:

a.  a backdated debt-assignment agreement, which **WINTERS** had emailed to **HERMAN** earlier that day (see paragraph 47), that made it appear **MITCHELL** and **HERMAN** had acquired convertible debts one year before they actually acquired the debts; and

b.  a notice of conversion signed by **HERMAN** and bearing the apparent signature of K.T. as NuTech's chief executive officer.

49.  On August 18, 2015, **MITCHELL** emailed an application to Kingdom Trust Company to open an account for Bravo 20 Partners to hold shares of NuTech.

50.  On August 18, 2015, **WINTERS** emailed an application to Kingdom Trust Company to open an account for Intrepid Capital Holdings Corp to hold shares of NuTech. Intrepid Capital Holdings Corp is a Florida corporation controlled by **WINTERS** and **HERMAN**.

51.  On August 19, 2015, **HERMAN** sent an email to **WINTERS** with the subject line

12

"fix" and an attachment entitled "Consideration NERG.pdf." The attachment was an outgoing wire transfer request showing the $80,000 wire sent by **MITCHELL** from Bravo 20 Partners' bank account to **HORN** on December 23, 2014, for the "ECMZ Debt Conversion" as further described in paragraph 40. Later that same day, **WINTERS** sent an email to **HERMAN** with an attachment entitled "wire.pdf." This attachment was substantially identical to the outgoing wire transfer request **HERMAN** had sent to **WINTERS** except the amount wired had been altered to read $280,000 instead of $80,000.

52.     On August 19, 2015, **HERMAN** sent an email to Pacific Stock Transfer Company regarding the issuance of free-trading shares of NuTech in which he states, "All the free trading shares are being issued on percentage basis of ownership from the cumulative dollar consideration which was pretty good number of $280,000." [*sic.*] The email also contained the following documents:

      a.  the backdated debt-assignment agreement, which **WINTERS** had emailed to **HERMAN** on July 27, 2015 (see paragraph 47), that made it appear **MITCHELL** and **HERMAN** had acquired convertible debts one year before they actually acquired the debts;

      b.  the altered outgoing wire transfer request, which **WINTERS** had created and emailed to **HERMAN** earlier that day (see paragraph 51), falsely showing that **MITCHELL** had wired $280,000 from Bravo 20 Partners' bank account to **HORN** on December 23, 2014, for the "ECMZ Debt Conversion," when in fact **MITCHELL** had wired only $80,000 to **HORN** that day;

      c.  a notice of conversion signed by **HERMAN** and bearing the apparent signature of K.T. as NuTech's chief executive officer; and

      d.  a spreadsheet listing who should receive free-trading shares of NuTech, including individuals and entities related to **MITCHELL**, **HERMAN**, and **WINTERS**.

53.     On August 22, 2015, **HERMAN** sent an email to Pacific Stock Transfer Company regarding the issuance of free-trading shares of NuTech in which he states, "In case you were

confused, all the parties getting the stock via debt conversion are shareholders of Bravo 20 and its

a distribution to its ownership. That's how the 280 was used to buy that particular debt." [*sic.*]

54.     On September 2, 2015, **HERMAN** sent an email containing documents to Pacific

Stock Transfer Company to support the issuance of free-trading shares of NuTech. These

documents included:

> a.  a purchase and assignment of interest in wells and leases dated December 23, 2014,
>     that claims to transfer 5 billion shares of EcoEmissions stock to Bravo 20 Partners
>     in exchange for $280,000 and an assignment of wells, which document bears the
>     apparent signatures of **MITCHELL** and L.L.;
>
> b.  the altered outgoing wire transfer request, which **WINTERS** had created and
>     emailed to **HERMAN** on August 19, 2015 (see paragraph 51), and an altered bank
>     statement falsely showing that **MITCHELL** had wired $280,000 from Bravo 20
>     Partners' bank account to **HORN** on December 23, 2014, for the "ECMZ Debt
>     Conversion," when in fact **MITCHELL** wired only $80,000 to **HORN** on that day;
>
> c.  a notice of conversion signed by **HERMAN** and bearing the apparent signature of
>     K.T. as NuTech's chief executive officer; and
>
> d.  an email showing that NuTech's trading symbol had changed to NERG on June 26,
>     2015.

55.     On September 8, 2015, **HERMAN** sent an email to **WINTERS** with the subject

line "ian horn." The body of the email read: "Could you send me a blank word doc with Ian's

letterhead." That same day, **WINTERS** sent an email to **HERMAN** with an attachment entitled

"Horn and assoc letterhead.docx." This attachment included **HORN's** letterhead and a digital copy

of **HORN's** signature.

56.     On September 16, 2015, **WINTERS** sent another email to **HERMAN** with the

attachment entitled "Horn and assoc letterhead.docx" as further described in paragraph 55.

57.     On or before September 16, 2015, **HERMAN** and **HORN** created two attorney-

opinion letters related to the issuance of free-trading shares of NuTech as if the letters had been

written by **HORN** and contained his legal opinions. In fact, each letter was written in significant part by **HERMAN** and contained false and misleading information. **HORN** did not review the information in each letter before signing and issuing each letter on his letterhead.

58.     On September 18, 2015, **HERMAN** sent two email messages containing documents to Pacific Stock Transfer Company to support the issuance of free-trading shares of NuTech. These documents included:

    a.   statements of non-affiliation that falsely state **MITCHELL**, **HERMAN**, and **WINTERS** are not affiliates of, and did not control, NuTech;

    b.   a purchase and assignment of interest in wells and leases dated December 23, 2014, that claims to transfer 5 billion shares of EcoEmissions' stock to Bravo 20 Partners in exchange for $280,000 and an assignment of wells;

    c.   the two attorney-opinion letters described in paragraph 57;

    d.   a resolution of NuTech's board of directors, which bears the apparent signature of K.T. as NuTech's chief executive officer, that claims the company's board of directors had met and authorized the issuance of shares based on the "legal conversion from debt to equity as presented to the Transfer Agent, Pacific Stock Transfer";

    e.   a notice of conversion signed by **HERMAN** and **MITCHELL**, and bearing the apparent signature of K.T. as NuTech's chief executive officer, claiming to convert an unpaid note into approximately 13 billion shares of non-restricted NuTech stock; and

    f.   statements of non-affiliation signed by N.M., K.M., and C.J.H.

59.     On or before September 23, 2015, **HERMAN** and **HORN** created an attorney-opinion letter related to the issuance of free-trading shares of NuTech as if the letter had been written by **HORN** and contained his legal opinions. In fact, the letter was written in significant part by **HERMAN** and contained false and misleading information. **HORN** did not review the information in the letter before signing and issuing the letter on his letterhead.

15

60.     On September 23, 2015, **HERMAN** sent an email to **WINTERS** with the subject line "call u in two" and an attachment entitled "Assignment Bravo E Pro.docx." The attachment was a draft purchase and assignment of interest in wells and leases between Bravo 20 Partners and EcoEmissions dated December 23, 2014. Less than 30 minutes later, **HERMAN** sent a second email with the subject line "doc edit" containing text describing an alleged transfer of debt instruments, consulting agreements, and 5 billion shares of EcoEmissions stock from E-Pro Systems LLC to Bravo 20 Partners in exchange for $280,000 and an assignment of wells. Approximately 20 minutes later, **WINTERS** sent an email to **HERMAN** with an attachment entitled "Assignment Bravo E Pro.docx." This version of the assignment document included the text sent by **HERMAN** in the "doc edit" email, and digital copies of the signatures of D.R. and G.P., which signatures were forged and unauthorized.

61.     On September 23, 2015, **HERMAN** emailed documents to Pacific Stock Transfer Company to support the issuance of free-trading shares of NuTech. These documents included:

   a.   the attorney-opinion letter described in paragraph 59; and

   b.   the E-Pro purchase and assignment of interest in wells and leases dated December 23, 2014, bearing the forged and unauthorized digital signatures of D.R. and G.P., which **WINTERS** had created and emailed to **HERMAN** earlier that day (see paragraph 60).

62.     On September 26, 2015, **HERMAN** emailed a statement of non-affiliation to Pacific Stock Transfer Company to support the issuance of free-trading shares of NuTech. The statement included the forged and unauthorized digital signatures of D.R. and G.P.

63.     On September 28, 2015, **HERMAN** emailed documents to Pacific Stock Transfer Company to support the issuance of free-trading shares of NuTech, including corporate resolutions signed by K.M. and C.J.H. in Wyoming. That same day, Pacific Stock Transfer Company issued

approximately 13 billion free-trading shares of NuTech to a number of individuals and entities, including individuals and entities related to **MITCHELL, HERMAN**, and **WINTERS**. These stock certificates were shipped by interstate courier to **HERMAN** in Pennsylvania.

64.     Between November 3 and November 9, 2015, **HERMAN, MITCHELL**, and co-conspirators known and unknown to the grand jury sold approximately 6.3 million shares of NuTech stock to the public. During this time period, at least one investor in Wyoming purchased NuTech shares in a public sale. The conspirators used Skype to coordinate their sales of NuTech stock and timed their sales to coincide with email promotions containing false and misleading information about NuTech.

65.     On January 28, 2016, **HERMAN** emailed documents to J.W. Korth & Company so that **HERMAN** and **WINTERS** could execute trades of NuTech and another company's stock. The documents included:

  a.  the backdated debt-assignment agreement described in paragraph 47;

  b.  the altered outgoing wire transfer request described in paragraph 51;

  c.  one of the two attorney-opinion letters described in paragraph 57;

  d.  the attorney-opinion letter described in paragraph 59; and

  e.  the E-Pro purchase and assignment of interest in wells and leases dated December 23, 2014, bearing the forged and unauthorized signatures of D.R. and G.P., described in paragraph 60.

66.     On January 29, 2016, **HERMAN** sent an email to J.W. Korth & Company to sell "1mm shares" of NuTech shares "ASAP."

67.     On or before March 1, 2016, **MITCHELL** created a Q3 2015 financial statement and disclosure for NuTech.

68.     On March 1, 2016, **WINTERS** used his email account to login and post the financial statement and disclosure described in paragraph 67 online at www.otcmarkets.com, where the statement and disclosure could be accessed in the District of Wyoming.

69.     On or before March 7, 2016, **HERMAN** and **HORN** created an attorney letter with respect to current information for NuTech as if the letter had been written by **HORN** and contained his legal opinions. In fact, the letter was written in significant part by **HERMAN** and contained false and misleading information. **HORN** did not review the information in the letter before signing and issuing it on his letterhead.

70.     On March 7, 2016, **MITCHELL** used kevin@nutechenr.com to login and post the attorney letter with respect to current information described in paragraph 69 online at www.otcmarkets.com, where the letter could be accessed in the District of Wyoming.

71.     On or before April 4, 2016, **HERMAN** and **HORN** created an attorney letter with respect to current information for NuTech dated April 3, 2016, as if the letter had been written by **HORN** and contained his legal opinions. In fact, the letter was written in significant part by **HERMAN** and contained false and misleading information. **HORN** did not review the information in the statement before signing and issuing it on his letterhead.

72.     On April 4, 2016, **MITCHELL** used kevin@nutechenr.com to login and post the attorney letter with respect to current information described in paragraph 71 online at www.otcmarkets.com, where the letter could be accessed in the District of Wyoming.

73.     On April 21, 2016, **MITCHELL** used kevin@nutechenr.com to communicate with staff at OTC Markets Group, and to login and update NuTech's online company profile published at www.otcmarkets.com, where that profile could be accessed in the District of Wyoming.

18

74.     On May 10, 2016, **MITCHELL** emailed the text of a press release to staff at OTC Markets Group. The email claimed that a Russian company had offered to buy NuTech for 2.5 cents per share.

75.     On or before May 16, 2016, **MITCHELL** wrote a script for K.T. to read on an investor conference call, which was available nationwide, including in the District of Wyoming. Following the script, K.T. provided false and misleading information about (among other things) the alleged offer to purchase NuTech.

76.     Beginning no later than May 9 and continuing through at least May 19, 2016, **HERMAN, MITCHELL,** and **WINTERS** sold approximately 65.5 million NuTech shares to the public. During this time period, at least one investor in Wyoming purchased NuTech shares in a public sale. As a result of these sales, **MITCHELL** received from Kingdom Trust over $103,000 on May 16 and over $28,000 on May 17.

77.     On May 17, 2016, **MITCHELL** wired $10,000 to **HERMAN.** This money came from the approximately $131,000 **MITCHELL** had received from Kingdom Trust on May 16 and May 17.

All in violation of 18 U.S.C. § 371.

## COUNT FOURTEEN
### Securities Fraud and Aiding and Abetting – 15 U.S.C. §§ 78j(b) and 78ff and 18 U.S.C. § 2

78.     Paragraphs 1-8, 24, and 27-77 are re-alleged for purposes of charging Count 14.

79.     Beginning on a date unknown to the grand jury but no later than on or about November 25, 2014, and continuing through a date unknown to the grand jury but at least on or about May 19, 2016, in the District of Wyoming and elsewhere, Defendants **ROBERT**

**WILLIAM MITCHELL, a/k/a Bob Mitchell, JUSTIN WALLACE HERMAN, CHARLES WINIFRED WINTERS JR., a/k/a Chuck Winters**, and **IAN HORN** did knowingly and willfully use and employ, and aid and abet the use and employment of, manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulation of the United States Securities and Exchange Commission, 17 C.F.R. § 240.10b-5, by:

   a.  employing a device, scheme, and artifice to defraud;

   b.  making untrue statements of material facts, and failing to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   c.  engaging in acts, practices, and a course of business which would, and did, operate as a fraud and deceit upon investors and potential investors in NuTech Energy Resources Inc.

in connection with purchases and sales of NuTech Resources Inc. securities, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

   In violation of 15 U.S.C. §§ 78j(b) and 78ff, and 18 U.S.C. § 2.

**COUNT FIFTEEN**
**Conspiracy to Commit Wire Fraud – 18 U.S.C. § 1349**

   80.   Paragraphs 1-8, 24, and 27-77 are re-alleged for purposes of charging Count 15.

   81.   Beginning on a date unknown to the grand jury but no later than on or about November 25, 2014, and continuing through a date unknown to the grand jury but at least on or about May 19, 2016, in the District of Wyoming and elsewhere, Defendants **ROBERT WILLIAM MITCHELL, a/k/a Bob Mitchell, JUSTIN WALLACE HERMAN, CHARLES WINIFRED WINTERS JR., a/k/a Chuck Winters**, and **IAN HORN**, with intent to defraud, did

20

knowingly and unlawfully combine, conspire, confederate, and agree with one another, and with

other persons known and unknown to the grand jury, to commit wire fraud in violation of 18 U.S.C.

§ 1343; that is, to "pump-and-dump" securities of NuTech Energy Resources Inc.

     In violation of 18 U.S.C. § 1349.

### COUNTS SIXTEEN & SEVENTEEN
**Aggravated Identity Theft – 18 U.S.C. § 1028A(a)(1)**

82.     Paragraphs 60 and 61 are re-alleged for purposes of charging Counts 16 and 17.

83.     On or about September 23, 2015, in the District of Wyoming and elsewhere,

Defendants **JUSTIN WALLACE HERMAN** and **CHARLES WINIFRED WINTERS JR.,**

**a/k/a Chuck Winters,** did knowingly possess and use, without lawful authority, a means of

identification of another person during and in relation to a wire fraud conspiracy in violation of 18

U.S.C. § 1349, and the Defendants did so knowing that the means of identification belonged to

another actual person; that is, in furtherance of the "pump-and-dump" conspiracy charged in Count

15 of this indictment, Defendants **HERMAN** and **WINTERS** possessed and used the means of

identification described below to create and email a misleading purchase and assignment of interest

in wells and leases dated December 23, 2014.

| COUNT | MEANS OF IDENTIFICATION |
|-------|-------------------------|
| Sixteen | The forged and unauthorized digital signature of D.R., who is a real person known to the grand jury |
| Seventeen | The forged and unauthorized digital signature of G.P., who is a real person known to the grand jury |

     In violation of 18 U.S.C. § 1028A(a)(1).

## COUNTS EIGHTEEN & NINETEEN
### Aggravated Identity Theft – 18 U.S.C. § 1028A(a)(1)

84.     Paragraph 62 is re-alleged for purposes of charging Counts 18 and 19.

85.     On or about September 26, 2015, in the District of Wyoming and elsewhere, Defendant **JUSTIN WALLACE HERMAN** did knowingly possess and use, without lawful authority, a means of identification of another person during and in relation to a wire fraud conspiracy in violation of 18 U.S.C. § 1349, and the Defendant did so knowing that the means of identification belonged to another actual person; that is, in furtherance of the "pump-and-dump" conspiracy charged in Count 15 of this indictment, Defendant **HERMAN** possessed and used the means of identification described below to email a misleading statement of non-affiliation to Pacific Stock Transfer Company.

| COUNT | MEANS OF IDENTIFICATION |
|---|---|
| Eighteen | The forged and unauthorized digital signature of D.R., who is a real person known to the grand jury |
| Nineteen | The forged and unauthorized digital signature of G.P., who is a real person known to the grand jury |

In violation of 18 U.S.C. § 1028A(a)(1).

### FORFEITURE NOTICE

The allegations set forth above are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures. Upon conviction of any offense in violation of 18 U.S.C. §§ 1341, 1343, or 1349, Defendants **ROBERT WILLIAM MITCHELL, a/k/a Bob Mitchell, JUSTIN WALLACE HERMAN, CHARLES WINIFRED WINTERS JR., a/k/a Chuck Winters,** and **IAN HORN,** shall forfeit to the United States of America, under 18 U.S.C.

§ 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

The property to be forfeited by Defendant **MITCHELL** includes, but is not limited to, a money judgment for the proceeds obtained by **MITCHELL** from the scheme to defraud investors charged in Counts 1-12, and the proceeds obtained by **MITCHELL** from the "pump-and-dump" conspiracy charged in Count 15.

The property to be forfeited by Defendants **HERMAN**, **WINTERS**, and **HORN** includes, but is not limited to, a money judgment for the proceeds obtained by **HERMAN**, **WINTERS**, and **HORN** from the "pump-and-dump" conspiracy charged in Count 15.

The United States of America shall be entitled to forfeiture of substitute property under 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), if any of the property described above, as a result of any act or omission of the Defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).


A TRUE BILL:


_____*Ink Signature on File*_____
FOREPERSON


_____*Mark Klaassen*_____
MARK A. KLAASSEN
United States Attorney


23

## PENALTY SUMMARY

**DEFENDANT NAME:**    **ROBERT WILLIAM MITCHELL, a/k/a Bob Mitchell,**

**DATE:**    November 19, 2019

**INTERPRETER NEEDED:**    No

**VICTIM(S):**    Yes

**OFFENSE/PENALTIES:**

   **Cts: 1-8**    **18 U.S.C. § 1343**
      (Wire Fraud)

      0-20 Years Imprisonment
      Up To $250,000 Fine
      3 Years Supervised Release
      $100 Special Assessment

   **Cts: 9-10**    **18 U.S.C. § 1348(1)**
      (Securities Fraud)

      0-25 Years Imprisonment
      Up To $250,000 Fine
      5 Years Supervised Release
      $100 Special Assessment

   **Cts: 11-12**    **18 U.S.C. § 1341**
      (Mail Fraud)

      0-20 Years Imprisonment
      Up To $250,000 Fine
      3 Years Supervised Release
      $100 Special Assessment

   **Ct: 13**    **18 U.S.C. § 371**
      (Conspiracy to Commit Securities Fraud)

      0-5 Years Imprisonment
      NMT $250,000 fine
      3 years supervised release
      $100 special assessment

Ct: 14   **15 U.S.C. §§ 78j(b) and 78ff and 18 U.S.C. § 2**
**(Securities Fraud and Aiding and Abetting)**

0-20 Years Imprisonment
$5,000,000 Fine
3 Years Supervised Release
$100 Special Assessment

Ct: 15   **18 U.S.C. § 1349**
**(Conspiracy to Commit Wire Fraud)**

0-20 years imprisonment
NMT $250,000 fine
3 years supervised release
$100 special assessment

**TOTALS:**                NMT 295 Years Imprisonment
Up To $8,500,000 Fine
5 Years Supervised Release
$1,500 Special Assessment

**AGENT:**                 Tim Pikas, DOI-OIG
Sonia Hacker, USPIS

**AUSA:**                  Eric J. Heimann, Assistant United States Attorney

**ESTIMATED TIME OF**
**TRIAL:**                 15 days

**WILL THE GOVERNMENT**
**SEEK DETENTION IN THIS**
**CASE:**                  No

**ARE THERE DETAINERS**
**FROM OTHER**
**JURISDICTIONS:**         No

2

---

**PENALTY SUMMARY**

---

**DEFENDANT NAME:**      **JUSTIN WALLACE HERMAN**

**DATE:**      November 19, 2019

**INTERPRETER NEEDED:**      No

**VICTIM(S):**      Yes

**OFFENSE/PENALTIES:**

**Ct: 13**      **18 U.S.C. § 371**
(Conspiracy to Commit Securities Fraud)

0-5 Years Imprisonment
NMT $250,000 fine
3 years supervised release
$100 special assessment

**Ct: 14**      **15 U.S.C. §§ 78j(b) and 78ff and 18 U.S.C. § 2**
(Securities Fraud and Aiding and Abetting)

0-20 Years Imprisonment
$5,000,000 Fine
3 Years Supervised Release
$100 Special Assessment

**Ct: 15**      **18 U.S.C. § 1349**
(Conspiracy to Commit Wire Fraud)

0 - 20 years imprisonment
NMT $250,000 fine
3 years supervised release
$100 special assessment

**Cts: 16-19**      **18 U.S.C. § 1028A(a)(1)**
(Aggravated Identity Theft)

2-8 Years Imprisonment – NLT 2 Years Consecutive to Any
      Sentence for Counts 13-15
NMT $250,000 fine
3 years supervised release
$100 special assessment

**TOTALS:**                      2-53 Years Imprisonment
                                 Up To $6,500,000 Fine
                                 3 Years Supervised Release
                                 $700 Special Assessment

**AGENT:**                       Tim Pikas, DOI-OIG
                                 Sonia Hacker, USPIS

**AUSA:**                        Eric J. Heimann, Assistant United States Attorney

**ESTIMATED TIME OF
TRIAL:**                         15 days

**WILL THE GOVERNMENT
SEEK DETENTION IN THIS
CASE:**                          No

**ARE THERE DETAINERS
FROM OTHER
JURISDICTIONS:**                 No

---

### PENALTY SUMMARY

---

**DEFENDANT NAME:**    **CHARLES WINIFRED WINTERS JR.,**
**a/k/a Chuck Winters**

**DATE:**    November 19, 2019

**INTERPRETER NEEDED:**    No

**VICTIM(S):**    Yes

**OFFENSE/PENALTIES:**

**Ct: 13**    **18 U.S.C. § 371**
(Conspiracy to Commit Securities Fraud)

0-5 Years Imprisonment
NMT $250,000 fine
3 years supervised release
$100 special assessment

**Ct: 14**    **15 U.S.C. §§ 78j(b) and 78ff and 18 U.S.C. § 2**
(Securities Fraud and Aiding and Abetting)

0-20 Years Imprisonment
$5,000,000 Fine
3 Years Supervised Release
$100 Special Assessment

**Ct: 15**    **18 U.S.C. § 1349**
(Conspiracy to Commit Wire Fraud)

0-20 years imprisonment
NMT $250,000 fine
3 years supervised release
$100 special assessment

**Cts: 16-17**    **18 U.S.C. § 1028A(a)(1)**
(Aggravated Identity Theft)

2-4 Years Imprisonment – NLT 2 Years Consecutive to Any
    Sentence for Counts 13-15
NMT $250,000 fine
3 years supervised release
$100 special assessment

**TOTALS:**

2-49 Years Imprisonment
Up To $6,000,000 Fine
3 Years Supervised Release
$500 Special Assessment

**AGENT:**

Tim Pikas, DOI-OIG
Sonia Hacker, USPIS

**AUSA:**

Eric J. Heimann, Assistant United States Attorney

**ESTIMATED TIME OF
TRIAL:**

15 days

**WILL THE GOVERNMENT
SEEK DETENTION IN THIS
CASE:**

No

**ARE THERE DETAINERS
FROM OTHER
JURISDICTIONS:**

No

6

## PENALTY SUMMARY

**DEFENDANT NAME:**  **IAN HORN**

**DATE:**  November 19, 2019

**INTERPRETER NEEDED:**  No

**VICTIM(S):**  Yes

**OFFENSE/PENALTIES:**

**Ct: 13**  **18 U.S.C. § 371**
(Conspiracy to Commit Securities Fraud)

0-5 Years Imprisonment
NMT $250,000 fine
3 years supervised release
$100 special assessment

**Ct: 14**  **15 U.S.C. §§ 78j(b) and 78ff and 18 U.S.C. § 2**
(Securities Fraud and Aiding and Abetting)

0-20 Years Imprisonment
$5,000,000 Fine
3 Years Supervised Release
$100 Special Assessment

**Ct: 15**  **18 U.S.C. § 1349**
(Conspiracy to Commit Wire Fraud)

0 - 20 years imprisonment
NMT $250,000 fine
3 years supervised release
$100 special assessment

**TOTALS:**  0-45 Years Imprisonment
Up To $5,500,000 Fine
3 Years Supervised Release
$300 Special Assessment

**AGENT:**  Tim Pikas, DOI-OIG
Sonia Hacker, USPIS

7

| | |
|---|---|
| **AUSA:** | Eric J. Heimann, Assistant United States Attorney |
| **ESTIMATED TIME OF TRIAL:** | 15 days |
| **WILL THE GOVERNMENT SEEK DETENTION IN THIS CASE:** | No |
| **ARE THERE DETAINERS FROM OTHER JURISDICTIONS:** | No |

8